IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLMERICA FINANCIAL BENEFIT | : | |
| INSURANCE COMPANY, *et al.*, | : | |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | 2:24-cv-02767 |
| | : | |
| HEIDI HUNT, *et al.*, | : | |
| | : | |
| *Defendants.* | : | |

**MEMORANDUM OPINION**

## I.     INTRODUCTION

Before this Court is Allmerica Financial Benefit Insurance Company and The Hanover Insurance Company's (Allmerica Plaintiffs'/Allmerica's) Motion for Judgment on the Pleadings (Dkts. 29, 30).  Heidi Hunt, individually and as the executrix of the estate of James Hunt, Corey Hunt, Sean Hunt, James P. Hunt, and Nicole Hamilton (Hunts) filed Response in Opposition (Dkt. 31).

This matter, initiated by the Allmerica Plaintiffs as an action for declaratory judgment, is born out of incredible tragedy.  Notwithstanding the compassion all decent people may want to advance those impacted by the facts below, it is this Court's job to apply a clinical and unemotional analysis to the pleadings.  Setting aside the sympathy that any reasonable person would feel for the Hunts, this Court finds that they must prevail as a matter of law.  For the following reasons, Allmerica's motion for judgment on the pleadings is denied.

1

## II.    Facts and Procedural Posture

On the morning of March 25, 2022, two motorists – strangers to each other – were driving their separate vehicles when they arrived side-by-side at a red traffic signal at the intersection of Lansdowne Avenue and Winding Way in Upper Darby, Pennsylvania.  Dkt. 31-1 (Hunts' Br., at 2-3).[1]  James Hunt (Insured Driver), a 56-year-old husband and father of four was driving a white 2020 Mercedes Sprinter van owned by his employer, TB Philly, Inc. (TB Philly).  Mr. Hunt was *en route* to deliver materials to a TB Philly client in Collingdale, Pennsylvania.

At the same time and place, Lloyd Amarsingh (Underinsured Driver/Tortfeasor), also a married father of four returning home from an overnight work shift, was operating his white 2008 Audi sedan.  *Id.* at 3.  Surveillance footage from a nearby high school captured both vehicles clearly positioned next to each other at the intersection, with Mr. Hunt's van in the right-hand southbound lane, and Mr. Amarsingh's Audi stopped slightly forward, immediately to the left of Mr. Hunt's van in the lefthand southbound lane, with no vehicles or pedestrians between them.  *Id.* at 3.

At approximately 7:54 AM, while both vehicles remained in use awaiting the green light, Mr. Amarsingh was seated in the fully reclined driver's seat of his Audi

---

[1]    In recounting the facts, the Court cites primarily to the Hunts' Brief as they are the party against whom the motion is addressed. *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017).  The parties represented at oral argument that they have agreed on the operative facts in this matter.  *See* N.T., at 4-5, 8. Oct 6, 2025.  Further, the Hunts' Brief cites primarily to law enforcement's official investigative documents, which this Court in turn cites by way of reference to the Hunts' Brief.

sedan while listening to loud music. *See id* at 4. At this precise moment, distracted by a text message, Mr. Amarsingh reached into his glove compartment, retrieved a firearm, and attempted to unload it. While unloading it, the firearm accidentally discharged sending a bullet through the Audi's rear passenger-side window. Due to the alignment of their vehicles and Mr. Amarsingh's seated position within his Audi, the bullet traveled directly into Mr. Hunt's vehicle, striking him in the left temple. *See* Hunts' Br. at 4.

Immediately after firing the weapon, Mr. Amarsingh panicked and fled the scene. He later admitted to investigators: "I got panicked. Didn't even know that I shot somebody, got panicked, and drive off. Run the red light, drive off, and drive straight home." *Id.* Surveillance video independently confirms Mr. Amarsingh's vehicle abruptly leaving the intersection, traveling at a high rate of speed southbound across Garrett Road.

Moments later, passing motorists discovered Mr. Hunt unresponsive in his vehicle, which was still running, with his body slumped forward over the steering wheel and a gunshot wound visible on the left side of his head. When Upper Darby police (UDPD) arrived, a witness was leaning into the driver's side Mr. Hunt's vehicle, manually depressing the brake pedal with his hands to prevent it from moving. *See id.*

Later that day, Mr. Amarsingh voluntarily surrendered to the authorities and consented to a search of his residence and vehicle. *Id.* at 5. Investigators located the white Audi sedan at his home, noting a single bullet hole in the rear passenger-side window of his Audi sedan. UDPD Detectives conducted a forensic examination of the

Audi, employing a trajectory rod to determine the precise path the bullet traveled. This forensic analysis indicated that, given Mr. Amarsingh's reclined position in the driver's seat, the bullet exited the Audi's rear passenger-side window at a distinct upward angle.  The trajectory analysis further confirmed that due to the precise alignment and relative heights of the two vehicles, the bullet traveled directly through the driver's side window of Mr. Hunt's van, striking him in the left temple. *See* Hunts' Br. at 5.

On March 26, 2022, Mr. Amarsingh was charged with murder, involuntary manslaughter, and possessing an instrument of crime. Dkt. 31-4 (UDPD Offense Report).  According to the Unified Judicial System of Pennsylvania database, Mr. Amarsingh entered a negotiated plea on involuntary manslaughter and possessing a weapon and was sentenced to 1-5 years confinement on each of those counts. According to Pennsylvania Department of Corrections' records, as of the date of this filing Mr. Amarsingh remains incarcerated at the Commonwealth's State Correctional Institution at Waymart.

At the time of Mr. Hunt's death, Allmerica insured Mr. Hunt's employer, TB Philly, under Policy No. AWY-D1-1-63-05 (Policy).  Allmerica's Br. at 3.  The Policy provides for non-stacked underinsured motorists coverage with a limit of $1,000,000 per covered vehicle.  The van driven by Mr. Hunt on the day of his death was covered under this policy.[2]  *Id.*

---

[2]      TB Philly also maintained excess and umbrella liability coverage through Hannover Insurance Company.  This Court granted the Allmerica Plaintiffs' Motion for Judgment on the Pleadings with respect to the umbrella policy in its September 26, 2025, Order.  *See* Dkt. 36.

4

In the Spring of 2024, nearly two years after Mr. Hunt's death, the Hunts, through counsel, informed Allmerica Plaintiffs that a settlement had been reached with Mr. Amarsingh's liability insurance for the policy limits available under his auto policy. Allmerica Compl. at ¶ 36; Hunts' Ans. at ¶ 36. In response, the Allmerica Plaintiffs consented to the settlement and waived subrogation rights but indicated that their investigation was ongoing and specifically reserved the right to disclaim coverage for UIM benefits under the Policy. Allmerica Compl. at ¶ 37; Hunts' Ans. at ¶ 37. In June of 2024, the Hunts demanded the UIM policy limits under the Policy. Shortly thereafter, Allmerica plaintiffs disclaimed UIM benefits under the Policy. Allmerica Compl. at ¶ 38-39; Hunts' Ans. at ¶ 38-39.

Allmerica filed a Complaint for Declaratory Judgment seeking to clarify and resolve its obligations under the Policy. The Hunts filed a timely Answer with affirmative defenses and counterclaims. Currently before this Court is Allmerica Plaintiffs' Motion for Judgment on the Pleadings. In the Motion, Allmerica asks this Court to:

(a)  Declare that the March 2025, 2022, incident involving the death of James Hunt did not *result from* the ownership, maintenance, or use of an underinsured motor vehicle;

(b)  Declare that Allmerica is not obligated to provide underinsured motorist benefits to the Hunts under the Policy in connection with the March 25, 2022 incident; and

(c)  Dismiss the Hunts' counterclaim for breach of contract against Hanover with prejudice.

Allmerica's Mot. at 2. (cleaned up, emphasis added).

The Hunts have filed a response in Opposition to Allmerica's Motion. (Dkt. 31). Attached to the Hunts' response is a proposed order asking this Court to deny Allmerica's Motion *and* issue an order obligating Allmerica to provide underinsured motorist benefits under the Allmerica Business Auto Policy. Relatedly, the parties seemed to indicate in their 26(f) report that there would be cross-motions for judgment on the pleadings.[3] *See* Dkt. 26 at 5. (Joint Report). However, at this juncture only the Allmerica Plaintiffs have moved for judgment as a matter of law, and the parties have informed this Court in writing that they intend to proceed solely with that motion. For that reason, there is no filing before this Court by which it can presently enter and order requiring Allmerica provide coverage, even though this Court has found as a matter of law that Allmerica's Motion must be denied.

## III.  Legal Standard

Under Federal Rule of Civil procedure 12(c), a party may move for judgment on the pleadings after the pleadings are closed, but early enough not to delay trial. Fed. R. Civ. P. 12(c). The Court will not grant judgment on the pleadings "unless the movant clearly establishes that no material issue of fact remains … and that [they are] entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (citation omitted). The Court may consider not only the pleadings, but also exhibits attached thereto, matters of public record and any undisputedly authentic documents that are attached to the motion if the claims are

---

[3]     At oral argument the parties briefly discussed treating the Hunts' response in opposition as a cross-motion for judgment on the pleadings. *See* N.T., at 3-4. Oct 6, 2025. The parties ultimately declined to proceed in that fashion.

based on those documents. *Atiyeh v. Nat'l Fire Ins. Co. of Hartford*, 742 F. Supp. 2d 591, 595 (E.D. Pa. 2010).

"In considering a motion for judgment on the pleadings, a court must accept all of the allegations in the pleadings of the party against whom the motion is addressed as true and draw all reasonable inferences in favor of the non-moving party." *Zimmerman*, 873 F.3d at 417-418. Stated differently, the Court must accept as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn therefrom and construe them in the light most favorable to the non-movant. *Tatis v. Allied Interstate*, LLC, 882 F.3d 422, 426 (3d Cir. 2018).

## IV. Discussion

### a. The Policy v. MVFRL

The Court begins, as it must, with the insurance contract language itself. The Policy provides:

> 1. We will pay all sums the insured is legally entitled to recover as compensatory damages from the owner or driver of an underinsured motor vehicle. The damages must result from bodily injury sustained by the insured caused by an accident. The owner's or driver's liability for **these damages must result from the ownership, maintenance or use of an underinsured motor vehicle**.
>
> 2. We will pay under this coverage only if Paragraph **a.** or **b.** below applies:
>
>> a. The limits of any applicable liability bonds or policies have been exhausted by payment of judgments or settlements; or
>>
>> b. A tentative settlement has been made between an insured and the insurer of the underinsured motor vehicle and we:

      (1) Have been given prompt written notice of such tentative settlement; and

      (2) Advance payment to the insured in an amount equal to the tentative settlement within 30 days after receipt of notification.

   3. No judgment for damages arising out of a suit brought against the owner or operator of an underinsured motor vehicle is binding on us unless we:

      a. Received reasonable notice of the pendency of the suit resulting in the judgment; and had a reasonable opportunity to protect our interest in the suit.

Allmerica's Br. at 3-4 (cleaned up, emphasis added). As indicated above, the Hunts settled with Mr. Amarsingh's liability insurance for the policy limits available under his auto policy. In response, Allmerica consented to the settlement and waived subrogation rights but indicated that their investigation was ongoing and specifically reserved the right to disclaim coverage for UIM benefits under the Policy. Thus, the heart of this dispute centers around the application of the language in paragraph one, which triggers coverage only if the damages "*result from* bodily injury sustained by the insured caused by an accident." *Id.* (emphasis added).

     Allmerica asserts, consistent with its policy language, that the UIM coverage endorsement requires that damages must result from bodily injury sustained by the insured caused by an accident and the underinsured's liability for said damages must *result from the ownership, maintenance, or use*, of an underinsured motor vehicle. *See id* at 8-9. Allmerica properly argues that Pennsylvania courts have consistently interpreted the phrase "resulting from" in an insurance policy as connoting proximate

causation. *See* Allmerica's Br. at 9. Allmerica's argument follows that "[b]y the terms of the [Policy], UIM benefits are only available if the ownership, maintenance, or use of a motor vehicle *proximately caused* [Mr. Hunt's] injuries." *Id.* (emphasis added). Allmerica's brief then pivots into several case illustrations suggesting that UIM coverage is generally triggered by "vehicle caused" accidents only.

In response, the Hunts draw the Court's attention towards Pennsylvania's Motor Vehicle Financial Responsibility Law (MVFRL) at 75 Pa.C.S. § 1731(c). From there, the Hunts assert two principal arguments: (1) the MVFRL generally requires a liberal interpretation – affording the greatest possible coverage to injured claimants in close or doubtful insurance cases; and (2) the MVFRL has codified a "but for" casual standard in the UIM space and Allmerica's attempt to contract in a more stringent standard frustrates a liberal interpretation and conflicts with the law. Hunts' Br. at 9-12.

The MVFRL requires that UIM coverage "provide protection for persons who suffer injury *arising out of* the maintenance or use of a motor vehicle and are legally entitled to recover damages therefor from owners or operators of underinsured motor vehicles." 75 Pa.C.S. § 1731(c) (emphasis added). This is in some tension with the Policy's language triggering UIM coverage only when liability *results from* the ownership, maintenance, or use of a motor vehicle.

The Third Circuit has engaged the distinction between the language "resulting from" and "arising out of" in the insurance policy context. In *Allstate Prop. & Cas. Ins. Co. v. Squires* the panel observed that:

the Pennsylvania Supreme Court case of *Manufacturers Casualty Insurance Co. v. Goodville Mutual Casualty Co.*, 403 Pa. 603, 170 A.2d 571 (1961) … held that "construed strictly against the insurer, 'arising out of' in an insurance policy means causally connected with, *not proximately caused by*. 'But for' causation, i.e. a cause and result relationship, is enough to satisfy this provision of the policy." *Id.* at 573. This formulation of "arising out of" is now well-settled in Pennsylvania, and has been applied in various insurance law settings, both when interpreting insurance policies and assessing issues arising by operation of statutes, even though some of the cases applying the formulation do not cite *Goodville*.

*Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 391–92 (3d Cir. 2012) (Cleaned up, emphasis added).

Having determined that the Policy language importing a proximate cause standard to trigger UIM coverage directly contradicts the MVFRL, this Court concludes that the Policy must yield to the statutory language of the MVFRL. *See Sayles v. Allstate Ins. Co.*, 219 A.3d 1110, 1126 (Pa. 2019) (finding certain auto insurance policy provisions that conflicted with the express requirements of the MVFRL void as against public policy); *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 207 (3d Cir. 2001) (observing that "insurers do not have a right to rewrite or undercut state legislation or policy."); *see also Squires*, 667 F.3d at 390 n.4. Thus, this Court rejects Allmerica's position that Mr. Hunt's injuries must have been proximately caused by Mr. Amarsingh's ownership, maintenance, or use of the underinsured vehicle for coverage to apply.[4]  Instead, this Court will employ the

---

[4]     A unanimous three-judge panel of Pennsylvania Superior Court recently analyzed an insurance policy exclusion under applicable Pennsylvania state case law.  *See Chris Eldredge Containers, LLC v. Crum & Foster Specialty Ins. Co.*, 335 A.3d 1216, 1218 (2025), *appeal granted*, No. 267 MAL 2025, 2025 WL 2950423 (Pa. Oct. 20, 2025).  This case discusses many of the cases cited by the parties in this matter.  Though the panel's ultimate holding comports with the understanding that the phrase "arising out of" is inconsistent with the concept of "proximate cause," this Court believes the analysis in that case is wanting.

statutorily required "but for" standard to determine if UIM coverage applies. Accordingly, for Allmerica to succeed on its Motion, it would need to demonstrate based on the facts as pled, with all reasonable inferences drawn in favor of the Hunts, that Mr. Amarsingh's use of his vehicle **was not**, as a matter of law, the but for cause of Mr. Hunt's death.

### b. Causal connection

The question of whether an accident arose out of the ownership, maintenance, or use of a motor vehicle is necessarily fact intensive. See *Squires*, 667 F.3d at 391 n.6. As such, each of the parties, and this Court, have performed an exhaustive review of the case law across jurisdictions searching for cases on all fours with the facts in this matter. After briefing and oral argument, no one has uncovered a case involving (1) an accidental shooting, where (2) both the shooter and the insured were vehicle oriented, but (3) operating separate vehicles in a roadway.

First, Allmerica takes a categorical approach, asserting that to satisfy any causation standard, be it contained in the UIM Policy itself or in the MVFRL, the harm must be "vehicle caused." Allmeria's Br. at 9-10 (citing *Eberhardinger v. City of York*, 341 F. Supp. 3d 420 (M.D. Pa. 2018), aff'd, 782 F. App'x 180 (3d Cir. 2019). According to Allmerica, the accidental discharge of Mr. Amarsingh's firearm

---

Generally, district courts should defer to the decisions of state intermediate appellate courts, absent an indication that the state's supreme court would rule otherwise. *See Jordan v. Nextus Billing Sols.*, No. CV 25-2692, 2025 WL 2778100, at *2 (E.D. Pa. Sept. 29, 2025) (Weilheimer, J.). The Pennsylvania Supreme Court has granted *allocatur* in *Chris Eldredge*. Though this Court is unable to divine a ruling or outcome, the Pennsylvania Supreme Court is likely to expound on causation standards in insurance contracts, generally. Recognizing that the outcome in *Chris Eldredge* may impact the analysis here, the Court simply wishes to flag the litigation for the benefit of the parties during the pendency of this litigation.

constituted an intervening act, not caused by the movement of the vehicle in the roadway or attributable to the common uses of a vehicle and thus, Mr. Hunt's resultant death should not be covered.  See Allmerica's Br. at 19-20.

Pennsylvania's intermediate appellate courts have consistently observed that the MVFRL "is not a general liability insurance intended to cover all injuries[.]" *Eberhardinger*, 341 F. Supp. 3d at 436-437 (collecting cases).  But the cases also indicate that "vehicle-caused" simply means there is "some causal connection between the motor vehicle and the injury."  *Cummings v. State Farm Mut. Auto Ins. Co.*, 596 A.2d 1138, 1139 (Pa. Super. 1991).  The cases do not stand for the proposition that there must be some kinetic occurrence with the vehicle itself for coverage to apply. In fact, such an interpretation of "vehicle-caused" would directly conflict with *Squires*, which is binding authority on this Court.

In *Squires*, the Third Circuit held that a policy holder was entitled to UIM coverage for injuries he sustained in an accident after swerving to avoid a box that had fallen from an uninsured motor vehicle.  *Squires*, 667 F.3d at 389.  "The parties … uncertain as to how the box came to be left on the road … stipulated that an unidentified vehicle dropped the box" in the roadway.  *Id.*  The policy at issue provided that the insurer would "pay damages to an insured person for bodily injury which an insured person is legally entitled to recover from the owner or operator of an uninsured auto.  Bodily injury must be caused by accident and arise out of the ownership, maintenance, or use of an uninsured auto."  *Id.* (emphasis added).  The lower court held that the policy was not triggered because the "arising out of"

language applied when a vehicle – and not some other object such as the box – was "the instrumentality causing ... the [a]ccident." *Id.* at 390.

The Third Circuit disagreed. In reversing the district court, the panel determined that the vehicle "was transporting the box as cargo." *Id.* at 393. Thus, "the accident was a direct consequence of the use of the vehicle for its intended purpose[.]" *Id.* at 393 (emphasis added) (citing Pennsylvania Vehicle Code, 75 Pa.C.S. § 102, defining "[v]ehicle" as "[e]very device in, upon or by which any person or property is or may be transported."). In sum, *Squires* informs us that the causation inquiry "is informed by – but does not necessarily turn on – the instrumentality directly causing the accident." *Id.* at 395.

### i. Pennsylvania precedent

At first glance, some Pennsylvania Superior Court cases addressing both shootings and car insurance seem to conflict with this principle. However, upon close examination, those cases are distinguishable from the facts in the instant matter. In *Ohio Cas. Grp. of Ins. Companies v. Bakaric*, cited at pages 12 and 20 of Allmerica's Brief, insurers petitioned for declaratory judgment in a wife's suit against her husband after the husband shot her in the face during a dispute while they were entering a parked car. 513 A.2d 462, 463 n.1 (Pa. Super. 1986), *appeal denied*, 520 A.2d 1384 (Pa. 1987). After a two-day jury trial on the issue of whether the homeowners or automobile insurance policy was required to provide coverage under the policy terms, the jury was instructed to answer sixteen special interrogatories. *Id.* at 463. Based on the jury's answers, the trial court

13

concluded that [the] homeowners' policy exclusion of injuries which were *intended or expected* by the insured, precluded coverage of injuries resulting from the shooting incident since those injuries were intended or expected by []husband.  The court also determined that Nationwide's policy covering damages resulting from the use of the insured automobile did not extend to [wife's] injuries *since they did not result from or arise out of* the parties' use of the automobile.

*Bakaric*, 513 A.2d at 463-464 (cleaned up) (emphasis added).

On appeal, the wife argued that her injury occurred while husband was loading himself into the vehicle which is consistent with the policy language affording coverage for injuries "resulting from the ownership, maintenance, use, loading or unloading" of the automobile.  *Id.* at 465.  The Superior Court disagreed.  In affirming the trial court, the panel observed that the operative policy employed the narrower language "resulting from" as opposed to the broader "arising out of" found in other policies.  *Id.* at 465.  Additionally, the court relied on the jury's determination "that the gun discharged as []husband was pushing appellant" and that the jury did not find "any connection to his entering or loading the vehicle."  *Id.* at 466.  Thus, even if the quoted language contemplated general liability, it would not apply since it was not clear that entering or loading the vehicle caused the injuries.  *Id.*

As previously stated, while this Court is not technically bound by the Pennsylvania Superior Court, great deference is generally owed to its holdings.  But there are several reasons why this Court's deference to the decision in *Bakaric* is blunted.  First, the panel in *Bakaric* was bound by the jury's advisory verdict and the trial court's ultimate determination that the shooting flowed from husband pushing his wife with the gun in his hand.  *Bakaric*, 513 A.2d at 464-465.  Here, although the

14

parties agree on the operative facts, there is no clear agreement on causation found in the pleadings.

Second, *Bakaric* was decided in 1986, prior to the enactment of the MVFRL. This is not to say that the updated statutory regime would yield a different result in *Bakaric* if it were decided today. *See Alvarino by Alvarino v. Allstate Ins. Co.*, 537 A.2d 18, 20 (Pa. Super. 1988). However, MVFRL impacts the Policy in this matter in a way that its predecessor legislation did not impact the policy in *Bakaric*. Namely, the MVFRL alters the causation standard through which this Court must analyze the facts – striking the proximate cause language and exchanging it for a "but for" legal cause approach.[5]

Finally, the facts in *Bakaric* are critically different than the facts in the matter before this Court. *Bakaric* involved a domestic dispute, a single vehicle, and intentionally unlawful behavior on the part of one of the parties. Additionally, the vehicle was parked and the engine off at the time the wife was shot. In this way, the car was truly just the situs of the incident. Conversely, Mr. Hunt's injury occurred under more dynamic circumstances. Here, two vehicles – one belonging to the tortfeasor and the other belonging to the decedent – were actually in the roadway at a stoplight at the time of the incident. This alone demonstrates that the vehicles here were "in use" in a way not present in *Bakaric*. Additionally, based on the UDPD's investigation, the factual basis for the charges, and the plea, Mr. Amarsingh's behavior was truly accidental.

---

[5]       The panel in *Bakaric* suggested that such a change would not impact its analysis. *Id.* at 465 (*citing Erie Ins. Exch. v. Eisenhuth*, 451 A.2d 1024 (Pa. Super. 1982). This suggestion is *dicta*, as the statute at issue in that case did not alter the causation analysis.

Other gunshot cases cited by Allmerica share the same comparative flaws. In *Glad v. State Farm Mut. Auto. Ins. Co.*, cited at page 13 of Allmerica's Brief. the Superior Court affirmed the denial of coverage under the Pennsylvania No-fault Motor Vehicle Insurance Act where decedent was intentionally shot and killed after exiting his parked vehicle during a dispute with the operator of another parked vehicle. 485 A.2d 499 (Pa. Super. 1984). The panel held "the *unprovoked, intentional shooting* of [decedent] was not within the scope of protection contemplated by the Legislature." *Id.* at 501.

Similarly, in *Lewis v. Nationwide Ins. Co.*, cited at page 14 of Allmerica's Brief, the court granted insurers motion for summary judgment, finding that the insured did not suffer an injury arising out of the maintenance or use of a motor vehicle. 541 F. Supp. 951 (M.D. Pa. 1982). There, plaintiff pulled over to the side of the road to allow a tailgater to pass. Instead, the tailgater pulled over and stopped behind the plaintiff, at which point plaintiff exited his vehicle to address the tailgater by tailgater's driver side window. The tailgater ultimately pulled a firearm from the glovebox and plaintiff was shot twice and fell to the ground alongside tailgater's vehicle and remained there until EMS arrived. *Id.* at 952-953. The court held that the plaintiff's injuries did not arise out of the maintenance or use of a motor vehicle. Notably, the court observed that the undisputed facts revealed that the "injury was caused by two gunshot wounds, sustained *at a time when plaintiff was neither occupying, entering into, or alighting from* his automobile." *Id.* at 956 (emphasis added).

In *Eberhardinger*, cited at pages 14-15 of Allmerica's Brief, the court found that a passenger shot by police while riding in an insured vehicle involved in a highspeed chase was precluded from claiming UIM benefits because the gunshot related injuries did not arise out of the maintenance or use of a motor vehicle. 341 F. Supp. at 437.  While the parties disputed the danger the officer was in when he discharged his weapon, the undisputed facts indicated that the officer used his vehicle to box in the fleeing suspects, exited his car and intentionally fired into the vehicle, striking the passenger.  *Id.* at 427.

Similarly in *Erie Ins. Exch. v. Eisenhuth*, a case not cited by Allmerica, a police officer was forced to open fire on a vehicle after the driver intentionally and recklessly drove toward the officer to evade capture.  451 A.2d 1024 (Pa. Super. 1982).  To avoid being struck the officer jumped onto the hood of the vehicle and fired into the car, accidentally shooting the passenger.  The passenger sued the driver and his insurance company for damages arguing that, but for his presence in the fleeing vehicle, he would not have been shot and therefore his injuries arose out of the use of the uninsured vehicle.  Viewing this scenario through the prism of the Pennsylvania No-Fault Act,[6] the Superior Court rejected plaintiff's argument, holding that his injuries did not arise out of the operation of the vehicle.  *Id.* at 1025.  In so holding, the panel expressly side-stepped the issue of intentionality.  *Id.*

Several Superior Court cases engaging causation and automobile insurance cite *Day v. State Farm Mut. Ins. Co.*, 396 A.2d 3 (Pa. Super. 1978).  Accordingly, it is worth spending a moment examining *Day* as an important step in the caselaw.  In

---

[6]    The Pennsylvania No-Fault Act was repealed in 1984 and replaced by the MVFRL.

*Day*, two drivers, Day and Williams (tortfeasor), exited their respective vehicles and began to fight after their vehicles collided along Roosevelt Boulevard in Northeast Philadelphia.  Plaintiff broke his ankle during the altercation and brought a claim against the insurer to recover under the uninsured motorist provision of his automobile policy.  The trial court vacated the arbitration award in favor of insurer and entered judgment for the insured.  The Superior Court reversed.  The panel explained that

> Day's broken ankle was caused by Williams knocking him down with his fists, not with his truck.  In point of fact, no injury was caused by the collision of the two vehicles in question.  *Williams was clearly not behaving as a motorist at the time of his assault on Day.*
> *Day could not have recovered from Williams' automobile carrier for the type of injury he received in the fight, and he is also precluded from recovering from his own carrier*, State Farm, under the terms of the Uninsured Motorist provision of his policy.

*Day*, 396 A.2d at 5 (emphasis added).

Separately, the court in *Day* observed that the tortfeasor's insurance denied liability on the grounds that Day's injury was intentionally inflicted.  *Id.* at 4.  The panel remarked that "the real issue … involved the instrumentality used to cause the injury, not whether it was intentionally or accidentally inflicted.  [UIM] provisions are designed to compensate victims for vehicle-caused injuries.  There must be some connection between the harm done and the insured vehicle."  *Id.*  at 5 (*citing Wheeler et al. v. London Guarantee & Accident Co.*, 140 A. 855 (Pa. 1928)).

*Day*'s analysis provides some important data points upon which the Court can distinguish the instant matter.  First, both Mr. Hunt and Mr. Amarsingh were behaving as motorists at the time of the incident.  Second, Mr. Hunt's estate did in

fact recover from Mr. Amarsingh's carrier as a result of the accidental shooting. These points distinguish this matter from the facts in *Day*. Third, the panel in *Day* seemed to place a greater importance on the instrumentality causing the accident as compared to the intent or culpability of the tortfeasor.[7]  And finally, the panel observed that UIM provisions are designed to compensate victims for vehicle-caused injuries, explaining that there must be some connection between the harm and the insured vehicle.  *See Day*, 396 A.2d at 5.  To make this final point, *Day* cites to *Wheeler*, a Pennsylvania Supreme Court case from 1928.

This Court is ever mindful that it is tasked with predicting how the Pennsylvania Supreme Court would decide these same issues were that tribunal presiding.  *See Lewis*, 541 F. Supp. at 955.  Considering this task, Pennsylvania Supreme Court source material used to inform the reasoning of the Commonwealth's intermediate courts is vital to understanding the *series rerum judicatarum*. Accordingly *Day*, as well as subsequent cases expounding on *Day*, must be viewed through the prism of *Wheeler*.  *See also Eisenhuth* (*citing Day* and *Wheeler*); *Glad* (same); *see also Lewis* (*citing Day*); *Bakaric* (*same*).

In *Wheeler* an insured truck was contracted to transport two heavy steel girders to a particular area on a construction site where a garage was being built. *Wheeler,* 140 A. at 855.  Logistics made it impossible to unload the girders to the precise location contemplated by the contractors.  To make good on the delivery, the

---

[7]        *But see* 9 Jordan R. Plitt, *et al.*, *Couch on Insurance* § 123:34 (3d ed. Dec. 2025 update) ("Courts often find that intentional shootings, road rage, fights, drag races, and rapes do not arise out of the use of the uninsured vehicle and thus are not covered.").

steel beams were removed from the truck and placed on the ground, partially protruding onto the sidewalk. Eventually the smaller of the two beams was dragged in using tackle and the motor power of the truck. *Id.* at 856. The larger beam required planks and rollers to facilitate its removal from the sidewalk. While the planks and rollers were being placed, the insured truck sat idling across the street. During this same time, a young boy walking down the street climbed upon the steel beam which then began to rock and eventually crushed the boy's foot requiring amputation.

Defendant argued that at the time of the accident, the girder was no longer upon the truck which stood across the street and that this completely severed the service and use of the truck from the cause of the injury. *Id.* at 856-857. A divided Pennsylvania Supreme Court disagreed. The majority explained that the insured truck "was an indispensable agency in the work, under the circumstances, and, as such, was at no time disconnected from it." *Id.* at 857. The court concluded that "the truck was the chief and wholly essential factor in the work … its motor was either furnishing the power, or during brief delays occasioned by preparatory work, was kept running and in close proximity." *Id.* (cleaned up).

Justice Simpson, joined by Chief Justice Moschzisker, dissented, explaining that he would have entered judgment in favor of the defendant. The dissent explained that at the time of the accident, the truck was "standing idle on the opposite side of the street from the place where the accident happened[.]" *Wheeler*, 140 A. at 857 (Simpson, J., dissenting). Unpersuaded by the majority's reasoning Justice Simpson viewed the trucks use as bracketing the boy's injuries and that such use

"does not make the accident one which happened in connection with the use and operation of the truck[.]"  *Id.* (Simpson, J., dissenting).

This Court acknowledges that *Wheeler* is not dispositive here.  However, in light of the actual facts in *Wheeler*, it is confounding to this Court that panel after panel of the Pennsylvania Superior Court would cite to *Wheeler* (or to *Day* quoting *Wheeler*) for the proposition that accidents must be vehicle caused.  The injuries in *Wheeler* were specifically not caused by the insured truck – a point on which the dissent in *Wheeler* resolutely stands.  Certainly, in the century since *Wheeler*, the caselaw has evolved along with different legislative enactments and regulatory changes.  However, to the extent cases, either directly or indirectly, cite *Wheeler* as high court precedent establishing the concept that but-for causation requires at a minimum for accidents to be vehicle caused, this Court finds those citations curious.  Further, all the Superior Court precedent cited by Allmerica involve intentional shootings, or altercations that occurred while the vehicles were not in use.  Here, both Mr. Amarsingh and Mr. Hunt were operating their vehicles in the roadway.  Neither party exited their vehicle to confront the other and the injury was unintentional.  There is no comparator case addressing but-for causation in a scenario baring these hallmarks.

### ii.  Persuasive authority from other jurisdictions

Allmerica cites a substantial body of caselaw from other jurisdictions in support of its denial of UIM coverage.  *See* Allmerica's Br. at 15-18.  Like the Pennsylvania authority it cites, these cases deal with mostly intentional shootings, or situations where the vehicle is parked and not being used as a vehicle.  *See Kish v.*

*Cent. Nat. Ins. Grp. of Omaha*, 424 N.E.2d 288, 294 (Ohio 1981) ("[T]he intentional, criminal act of the murder was an intervening cause of injury unrelated to the use of the vehicle."); *Mason v. Celina Mut. Ins. Co.*, 423 P.2d 24, 24 (Colo. 1967) ("The vehicle was parked at the time, the engine was not in operation and no part of [shooter's] body struck the vehicle to occasion the discharge of the firearm."); *U. S. Fid. & Guar. Co. v. W. Fire Ins. Co.*, 450 S.W.2d 491, 492 (Ky. 1970) (shooter and victim traveling in same car and the parties stipulated that neither the operation nor any movement of the car caused the accident, nor did any condition of the highway contribute to the accident); *Criterion Ins. Co. v. Velthouse*, 751 P.2d 1, 5 (Alaska 1986) (shooter believed gun was empty when he was horsing around with friends in vehicle and pointed shotgun at victim; the court held that vehicle was the mere situs of the accident and that the injuries resulted from negligent use of the gun, not the use of the truck.); *Fla. Farm Bureau Ins. Co. v. Shaffer*, 391 So. 2d 216, 216-217 (Fla. Dist. Ct. App. 1980) (intentional car chase and shooting); *Taylor v. Phoenix Ins. Co.*, 622 So. 2d 506, 507 (Fla. Dist. Ct. App. 1993) (innocent motorist struck during an intentional car chase and shooting); *Kessler v. Amica Mut. Ins. Co.*, 573 So. 2d 476, 477 (La. 1991) (intentional road rage shooting).

As stated above, none of these cases, either individually or in any combination, address the scenario before Court, where: (1) the shooting was accidental; and (2) both the shooter (also driver) and the insured are vehicle oriented, operating separate cars in the roadway at the time of the injury. Although the parties diligent research and briefing has yielded no factually analogous cases, some jurisdictions have developed distinct frameworks to address shootings in the vehicle insurance context.

Courts in other jurisdictions seem to have adopted two distinct approaches. The first approach organizes vehicle shootings into four distinct categories:

1. The accidental discharge of guns inside vehicles while the occupant is handling or toying with the gun. In these cases, the claimants are typically denied coverage because the vehicles are viewed as the mere situs of the resultant injuries.

2. The accidental discharge of guns being loaded or unloaded from vehicles. These cases generally find the coverage exists. There is a subcategory of cases involving the accidental discharge of guns resting or being removed from gun racks permanently attached to vehicles. Courts tend to engage the fact that the attached gun rack indicates a causal connection between the typical use of the vehicle and the discharge.

3. The use of a vehicle or a portion thereof as a gun rest. Court's appear divided on coverage in this context. However, the use of a vehicle as a gun rest necessarily contemplates intentional discharge of the firearm.

4. The accidental discharge of guns inside a vehicle caused by the movement or operation of the vehicle. Courts generally require coverage in these scenarios.

*See generally Taliaferro v. Progressive Specialty Ins. Co.*, 821 So. 2d 976 (Ala. 2001); *Cameron Mut. Ins. Co. v. Ward*, 599 S.W.2d 13 (Mo. Ct. App. 1980).

The facts here do not neatly comport with the four categories above. The accidental discharge of the gun happened within Mr. Amarsingh's vehicle, but the projectile exited his vehicle and struck Mr. Hunt who was driving a separate car in the same roadway. Mr. Amarsingh's car cannot properly be described as "the mere situs" of the accident because the injury occurred inside another car in the roadway.

By way of further observation, both vehicles were in the roadway by the very nature of their *use* at the time of the incident. Mr. Amarsingh's firearm was removed from the glovebox, not a permanently affixed gunrack. There is also no claim that Mr. Amarsingh intended to pull the trigger or that any movement of the vehicle caused the gun to misfire.[8]

The second approach takes the form of a two-prong test, asking whether: (1) the vehicle is regularly used to transport the firearm, and (2) the discharge of the firearm was the result of negligent, unintentional conduct. *State Cap. Ins. Co. v. Nationwide Mut. Ins. Co.*, 350 S.E.2d 66, 69-70 (1986); *Smith v. Stover*, 635 S.E.2d 501, 503 (N.C. Ct. App. 2006). These cases typically view the transportation of firearms as an ordinary and customary use of a motor vehicle. *See Taliaferro* 821 So. 2d at 980 (The term use has been a general catch-all term construed by courts to include all proper uses of a vehicle).

This reasoning marries neatly with binding authority on this Court in *Squires*. There, the panel stated that the uninsured "vehicle directly was involved in the accident as it was transporting the box as cargo – a common use for many types of vehicles traveling on a roadway." *Squires*, 667 F.3d at 393. The court emphasized that "the accident was a direct consequence of the use of the vehicle for its *intended purpose*" and that Superior Court cases denying coverage focused on "intervening actions [where] the injuries sustained were not attributable to common uses of a

---

[8]    However, the Hunts argued both in briefing and during oral argument that the reclined position of Mr. Amarsingh's driver's seat contributed to the bullet's trajectory and ultimately its lethality. *See* Hunts' Br. at 5, 7, 17; N.T., at 37-38. Oct 6, 2025.

vehicle."[9]  *Id.* (*citing Bakaric*; *Eisenhuth*; *Day* and others) (emphasis added).  This reasoning also squares with contemporary developments in our jurisprudence confirming that "Americans enjoy [the] right to keep and bear arms in their cars[.]" *Koons v. Att'y Gen. New Jersey*, 156 F.4th 210, 270 (3d Cir. 2025), *vacatur pending rehearing en banc*, Nos. 23-1900 & 23-2043, 2025 WL 3552513; *see also Suarez v. Paris*, 741 F. Supp. 3d 237, 258 (M.D. Pa. 2024) (*citing New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 32 (2022)).

Turning to the instant matter, there is limited and conflicting facts in the pleadings regarding Mr. Amarsingh's recurring interaction or travel with firearms. In his interview with UDPD, Mr. Amarsingh stated that he had limited experience with firearms and that he had purchased the weapon that killed Mr. Hunt just a week before the incident.  Dkt. 18, at 45.  During this limited period of ownership Mr. Amarsingh stated that he carries the weapon primarily in his car when he is going to work.  *Id.* at 46.  However, the data extracted from Mr. Amasingh's cellphone depicted several photos of firearms, Mr. Amarsingh holding firearms, and a video of Mr. Amarsingh singing with a firearm. Dkt. 31-4, at 8 (UDPD Offense Report).  Whatever the import of Mr. Amarsingh's armed travel to and from work, it cannot be said, viewed in the light most favorable to the Hunts, that the vehicle was not regularly used to transport a firearm.

---

[9]     Similarly, the Pennsylvania Supreme Court in *Wheeler* noted that the insured was "actually engaged in the transportation and delivery of merchandise and materials incidental to [its] business." *Wheeler*, 140 A. at 856.  Although *Wheeler* predates much of the car insurance caselaw, the high court's acknowledgement that the insured vehicle was being used for its intended purpose is in harmony with more recent cases analyzing coverage.

Next, the discharge of the firearm bares all the hallmarks of negligent, unintentional conduct.  As an initial matter, the fact that Mr. Amrasingh was driving and attempting to unload his firearm at the same time, even if momentarily stopped at a stoplight, is unquestionably negligent.[10]  Mr. Amarsingh's stated reason for attempting to unload the weapon when he did was that his kids generally run and hug him when he arrives home from work.  Dkt. 18, at 46.  That is a laudable safety precaution.  The irony here is that the most reasonable way for one to employ that safety precaution would be to unload the weapon, not on the road with your foot depressing the break pedal waiting for a green light, but once you safely pull off the road and park your vehicle.

Thus, in the absence of controlling Pennsylvania Supreme Court authority or persuasive Pennsylvania Superior Court precedent, this Court is inclined to view this case through the two-pronged analysis above, which accords with binding authority on this Court in *Squires*.  The pleadings and attached filings indicate that on the day of the incident, Mr. Amarsingh's vehicle was being used to transport himself and his weapon to and from work – a legitimate and intended purpose of his vehicle.  Further, the discharge was the result of negligent and unintentional conduct.  Based on the foregoing, it cannot be said as a matter of law that Mr. Amarsingh's use of his vehicle was not the but for cause of Mr. Hunt's injuries and Allmerica's motion is denied.[11]

---

[10]    *See* 75 Pa.C.S. § 3714 (Careless Driving); *Everette v. City of New Kensington*, 396 A.2d 467, 469-470 (Pa. Super. 1978) (Spaeth, J., opinion in support of affirmance).

[11]    Notably, the two-pronged analysis would not change the outcome in any of the Superior Court precedent cited by Allmerica.

In closing, this Court recognizes that this is a close case, the facts and circumstances of which will likely never be considered outside of this docket. In close our doubtful insurance cases, the law requires courts to err on the side of the insured. *Motley v. State Farm Mut. Auto. Ins. Co.*, 466 A.2d 609, 611 (Pa. 1983). Insurance contracts are generally contracts of adhesion – drafted by the insurer with little or no input from the consumer on terms. The industry as a whole, although heavily regulated, is impacted by traditional market pressures. When consumers first engage a commercial insurer for policy rates, insurers are best positioned to seek from the consumer information assessing their potential risk as a driver, including whether they typically travel with a firearm. Insurers presumably have the actuarial resources to calculate and spread risk among policy holders. This is not to say that insurers should always be on the hook because of their position at the time of contracting or because of their perceived ability to bear the cost of paying on the policy. But when the Court's judgment controls, public policy dictates the tie goes to the insured. *Id.*

Allmerica's Motion is denied. An appropriate order will follow.

BY THE COURT:

_____

GAIL A. WEILHEIMER,  J.
